**RSR CORPORATION, Petitioner**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 95–1559.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1996.

Decided Jan. 3, 1997.

David B. Weinberg, Washington, DC, argued the cause and filed the briefs for petitioner.

Patricia Ross McCubbin, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for respondent, with whom Lois J. Schiffer, Assistant Attorney General, and Alan H. Carpien, Attorney, Environmental Protection Agency, were on the brief.

Before: EDWARDS, Chief Judge, SILBERMAN and TATEL, Circuit Judges.

Opinion of the Court filed by Chief Judge Edwards.

HARRY T. EDWARDS, Chief Judge:

Under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the Environmental Protection Agency ("EPA") lists sites that pose a danger to public health or the environment on the National Priorities List ("NPL"). EPA uses the Hazard Ranking System ("HRS"), a mathematical model, to determine which sites should be listed. EPA promulgated the HRS in 1982 and amended it in 1990.

For many hazardous substances, the HRS incorporates a Human Toxicity Factor ("HTF") as one variable in the mathematical formula that results in the overall HRS score. For lead, the amended HRS assigns a HTF value of 10,000—the highest value—because EPA determined that lead is a highly toxic substance without a demonstrated threshold below which it causes no adverse health effects. On July 9, 1993, in response to a proposed listing of its site on the NPL, petitioner RSR Corporation ("RSR") challenged the lead HTF value. RSR argued that "new studies" demonstrate that this value is inappropriate.

We hold that RSR's challenge to the lead HTF value is untimely. Section 113(a) of CERCLA states that all CERCLA regulations must be challenged "within ninety days from the date of promulgation of such regulations." 42 U.S.C. § 9613(a) (1994). Because RSR did not raise its challenge to the lead HTF value until nearly three years after EPA promulgated the amended HRS, its challenge is barred by section 113(a).

RSR argues that this case comes within the *Geller v. FCC,* 610 F.2d 973 (D.C.Cir. 1979) exception to the timeliness rule. It contends that, due to the "new studies," an exception is justified in light of the "changed circumstances giving rise to a new cause of action beyond the statutory period for review," *Eagle–Picher Indus., Inc. v. EPA,* 759 F.2d 905, 909 (D.C.Cir.1985) ("*Eagle–Picher I*") (describing the *Geller* exception). We reject this contention, for the scope of the *Geller* exception is not as broad as petitioner would have it. If we were to allow petitioner to pursue a challenge based solely on "new studies" (whose meaning is in dispute), we would completely undermine the HRS as a means of listing sites on the NPL. *See id.* at 916–17 ("EPA would be forced, contrary to the will of Congress, to defend the HRS repeatedly, wasting both time and funds that would be better spent cleaning up hazardous wastes that threaten human health and the environment."). The proper place for RSR to raise its "new studies" argument is in a petition for a rulemaking.

We also reject RSR's other challenges: we conclude that EPA followed established procedures in calculating the background level of lead for the site, and that EPA did not act arbitrarily and capriciously in naming the site the "RSR Corporation Site." Accordingly, we deny RSR's petition.

## I. BACKGROUND

### A. Statutory and Regulatory Background

CERCLA provides a comprehensive statutory scheme for cleaning up releases or threatened releases of hazardous substances. See 42 U.S.C. §§ 9601–9675 (1994). Under CERLCA, Congress directed EPA to establish criteria to prioritize the cleanup of those sites presenting the greatest danger to public health or the environment. See id. § 9605(a)(8)(A). Sites meeting the criteria are placed on the NPL. See id. § 9605(a)(8)(B).

The HRS is a mathematical model—first promulgated in 1982, see 47 Fed.Reg. 31,180 (1982), and amended in 1990, see 55 Fed.Reg. 51,532 (1990)—that serves as a screening device for evaluating relative risks to health or the environment posed by releases of hazardous substances. See 40 C.F.R. pt. 300 app. A (1995). EPA evaluates risks by assigning numeric values from tables or formulas in the HRS to represent the dangers posed by the different features of hazardous substances at the sites. Overall HRS scores range from 0 to 100. See id. § 2.1.1. A site with a HRS score of 28.5 or greater is eligible for placement on the NPL. See 55 Fed.Reg. at 51,-569.

For many hazardous substances, the HRS incorporates a HTF as one variable in the mathematical formula that results in the overall HRS score. A HTF reflects a substance's potential to cause cancer or other adverse health effects. Depending on the particular substance's toxicity, a HTF may range in value from 0 to 10,000. For lead, the amended HRS assigns a HTF value of 10,000. See 40 C.F.R. pt. 300 app. A § 2.4.1.1. EPA determined that this value was appropriate because lead was found to be a highly toxic substance without a demonstrated threshold below which it causes no

adverse health effects. See Memorandum from Larry J. Zaragoza to HRS Docket, "Toxicity Factor Value for Lead" (Nov. 9, 1990), reprinted in Joint Appendix ("J.A.") 90–92.

The HRS also requires EPA to determine, for soil exposure pathways, if "observed contamination" is present at a site. Observed contamination is present if a hazardous substance attributable to the site is present at a concentration that is at least three times higher than the "background level." See 40 C.F.R. pt. 300 app. A tbl. 2–3, § 5.0.1.

### B. The RSR Corporation Site

The site at issue in this case is an abandoned secondary lead smelter in Dallas, Texas, and the approximately 13.6 surrounding square miles. A number of different companies operated the smelter from 1936 until 1984. RSR purchased the smelter in 1971.

In 1991 and 1992, EPA conducted extensive sampling at the RSR site. It then compared these samples with background data that the city of Dallas had gathered in 1983 and 1984 in a city-wide study of lead contamination in the soil. Because the on-site samples exceeded the background level by three times or more, EPA concluded that there was "observed contamination" at the site. As a result, it assigned a value of 550 for that variable, as called for by the HRS. See 40 C.F.R. pt. 300 app. A §§ 5.0.1, 5.1.1. EPA also assigned the site a HTF value of 10,000, as required by the HRS. See id. § 2.4.1.1 (setting the lead HTF value at 10,000). Inputting these two values into the HRS, EPA calculated a final HRS score of 50 for the site, a value above the 28.5 required for listing on the NPL, see 55 Fed.Reg. at 51,-569. On May 10, 1993, EPA proposed listing the site on the NPL. See 58 Fed.Reg. 27,-507, 27,513 (1993).

On July 9, 1993, RSR submitted comments challenging the proposed listing of the site. RSR challenged the fact that EPA assigned the site a lead HTF value of 10,000. It argued that "[n]umerous recent studies published since February 1989" demonstrate that this value is inappropriate. Comments of RSR Corporation in Opposition to the Proposed Listing of the "RSR Corporation Site" on the National Priorities List at 7

(July 9, 1993), *reprinted in* J.A. 361. In a footnote, RSR "petition[ed] EPA to revise the HRS consistent with these comments." *Id.* at 5 n. 1, *reprinted in* J.A. 359. RSR also made various challenges to EPA's determination of the "background level" and challenged EPA's naming the site the "RSR Corporation Site." *See id.* at 11–18, *reprinted in* J.A. 365–72.

In response, EPA asserted that RSR's comments on the lead HTF value constituted an untimely challenge to the HRS:

> Inasmuch as these comments question the adequacy of the HRS, this comment [sic] is untimely. Consistent with the Administrative Procedure Act, the present HRS was proposed on December 23, 1988; comments were received and responded to prior to its finalization in the December 14, 1990 *Federal Register,* and the period for filing a challenge to the promulgated rule has ended.
>
> The human toxicity factor value for lead will remain at 10,000 until the HRS is revised, at which time public comments will be solicited on this and any other values EPA proposes. Any reference material which supports a different human toxicity value for lead will be evaluated as part of this process.

EPA Response to Comments on the Proposed Listing of the RSR Corporation Site at 4.1–22 (1995) (citations omitted), *reprinted in* J.A. 1142. EPA also responded to RSR's challenges to the determination of the background level for the site. *See id.* at 4.1–12 to 4.1–19, *reprinted in* J.A. 1132–39. Finally, EPA concluded that the site was appropriately named the "RSR Corporation Site." *See id.* at 4.1–3 to 4.1–5, *reprinted in* J.A. 1123–25. On September 29, 1995, EPA listed the site on the NPL. *See* 60 Fed.Reg. 50,-435, 50,437 (1995).

## II. ANALYSIS

In this appeal, RSR challenges the HTF value for lead. This challenge, however, is barred by section 113(a) of CERCLA. Section 113(a) states:

> Review of any regulation promulgated under this chapter may be had upon application by any interested person only in the Circuit Court of Appeals of the United States for the District of Columbia. Any such application shall be made within ninety days from the date of promulgation of such regulations. Any matter with respect to which review could have been obtained under this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement or to obtain damages or recovery of response costs.

42 U.S.C. § 9613(a). This statutory time bar is "jurisdictional in nature," reflecting "a deliberate congressional choice to impose statutory finality." *Eagle–Picher I,* 759 F.2d at 911 (internal quotation omitted). Because RSR did not raise its challenge to the lead HTF value until nearly three years after EPA promulgated the amended HRS, its challenge is barred by section 113(a).

RSR argues that this case comes within an exception to the timeliness rule. RSR points to *Eagle–Picher I,* where we stated that exceptions to a statutory time bar "occasionally may be justified in the light of changed circumstances giving rise to a new cause of action beyond the statutory period for review." *Id.* at 909. We characterized this exception, derived from *Geller v. FCC,* 610 F.2d 973 (D.C.Cir.1979), as covering "a case in which events occur or information becomes available after the statutory review period expires that essentially create a challenge that did not previously exist." *Eagle–Picher I,* 759 F.2d at 913.

RSR asserts that the "numerous recent studies" bring this case within the *Geller* exception. We emphatically reject this contention. The *Geller* exception is extremely narrow. As we stated in *Eagle–Picher I,* "[w]e have entertained untimely claims only in a limited number of exceptional circumstances." *Id.* at 911. The narrowness of the *Geller* exception can be seen from *Geller* itself: in that case, the sole basis of the challenged regulation had "long since evaporated;" the court held that the agency was required to reexamine its regulations, despite the statutory deadline, in light of the "abnormal circumstances" of the case. *See Geller,* 610 F.2d at 979–80.

If we were to allow petitioner's challenge based on the "new studies" (whose meaning is *not* undisputed), we would undermine the HRS as a means of listing sites on the NPL. In other words, the *Geller* exception would swallow the rule. In *Eagle–Picher I*, we upheld the HRS as a means of listing sites based on the "narrow purpose" of the NPL and HRS—namely, "to provide an expeditious and relatively inexpensive initial determination of which sites may warrant further action under CERCLA." *Eagle–Picher I*, 759 F.2d at 909; *see also Eagle–Picher Indus., Inc. v. EPA*, 759 F.2d 922, 932 (D.C.Cir. 1985) ("*Eagle–Picher II*") ("[T]he NPL is simply a rough list of priorities, assembled quickly and inexpensively...."). If petitioners could repeatedly challenge the HRS, "EPA would be forced, contrary to the will of Congress, to defend the HRS repeatedly, wasting both time and funds that would be better spent cleaning up hazardous wastes that threaten human health and the environment." *Eagle–Picher I*, 759 F.2d at 916–17. Creating a "new studies" exception to section 113(a) would have precisely this effect.

The danger of a broad *Geller* exception can be seen in this case. Here, the relevance of the new studies is ambiguous: RSR argues that the new studies clearly undermine the lead HTF value, *see* Petitioner's Brief at 15–18, but EPA counters that the studies address an entirely different issue, *see* Brief for Respondent at 22 n.16. Under the broad reading of the *Geller* exception offered by petitioner, however, even these ambiguous data could force EPA to reassess the HRS. We reject petitioner's invitation to broaden the scope of the *Geller* exception. If we were to permit this challenge, we have little doubt that industry groups would be encouraged to develop "new studies" in every instance. The result would be to eviscerate the HRS, *Eagle–Picher I*, and section 113(a) (as applied to the HRS).

■ The proper place for RSR to raise its "new studies" argument is in a petition for a rulemaking. This avenue protects both the HRS and those challenging the HRS. On the one hand, EPA is given the leeway that Congress intended, as a denial of a rulemaking petition is subject to extremely narrow review, *see WWHT, Inc. v. FCC*, 656 F.2d 807, 818–19 (D.C.Cir.1981) ("It is only in the rarest and most compelling of circumstances that this court has acted to overturn an agency judgment not to institute rulemaking."). On the other hand, if the new studies in fact remove the factual premise on which the HTF value is based, we do not see how EPA could ignore this information. *See id.* at 819 ("[A]n agency may be forced by a reviewing court to institute rulemaking proceedings if a significant factual predicate of a prior decision on the subject ... has been removed.").

RSR could have argued that the footnote in its comments, *see* Comments of RSR Corporation at 5 n.1, *reprinted in* J.A. 359, constituted a petition for a rulemaking and that EPA arbitrarily and capriciously denied this petition. However, RSR failed to raise this issue before the court. In its Certificate of Rulings Under Review, RSR states only that it "seeks review of the final rule published in the *Federal Register* on September 29, 1995 ... to the extent it added the 'RSR Corporation Site' to the National Priorities List," Petitioner's Brief at i-ii (citing 60 Fed.Reg. 50,435). To the extent that RSR even argues that EPA arbitrarily and capriciously denied its rulemaking petition, RSR's argument is intertwined with a temporal claim—that EPA was required to "reconsider key elements of the Hazard Ranking System *before*" adding the site to the NPL, Petitioner's Brief at 11 (emphasis added). These contentions do not properly raise an argument that EPA arbitrarily and capriciously denied a rulemaking petition. Indeed, RSR's sole concern before this court has been to overturn the RSR site listing, not to secure a rulemaking without regard to the current listing. In other words, if EPA had granted the rulemaking petition, EPA could have listed the RSR site while conducting the rulemaking; and this is not what RSR wanted from this judicial proceeding. Thus, because RSR failed to pursue a demand for rulemaking before this court, we need not decide whether the footnote in RSR's comments to EPA constituted a petition for a rulemaking.

In addition to its challenge to the lead HTF value, RSR argues that EPA's determi-

nation of the background level for the site was unlawful: it challenges the timing and analysis of the background samples, the fact that the background samples were not validated, and the calculation of the background level. Because we conclude that EPA followed established procedures and reached justifiable results in determining the background level, we reject these challenges.

■ Finally, RSR argues that EPA acted arbitrarily and capriciously in naming the site the "RSR Corporation Site." We reject this argument. As EPA noted in its response to RSR's comments: "EPA prefers names that accurately reflect the location or nature of the problems at a site and that are readily and easily associated with a site by the general public.... The site is in the vicinity of what is now known as the RSR Corporation facility, and the lead release is related to activities at that facility." EPA Response to Comments at 4.1–4 to 4.1–5, *reprinted in* J.A. 1124–25. EPA's reasoning was not arbitrary and capricious. This con-

clusion is especially warranted in light of the limited purpose of the NPL. As noted above, the NPL only represents a "rough list" of priority sites, *Eagle–Picher II,* 759 F.2d at 932, and " 'listing does not require any action of any private party, nor does it determine the liability of any party for the cost of cleanup at the site,' " *Eagle–Picher I,* 759 F.2d at 920 (quoting 48 Fed.Reg. 40,658, 40,659 (1983)). Thus, EPA's naming of the site was not arbitrary and capricious.

## III.  CONCLUSION

For the foregoing reasons, we deny RSR's petition.