**APACHE POWDER COMPANY,**
**an Arizona Corporation,**
**Petitioner,**

**v.**

**UNITED STATES of America, United States Environmental Protection Agency, William K. Reilly, Administrator, U.S. Environmental Protection Agency, Respondents.**

**No. 90–1543.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 12, 1992.

Decided June 23, 1992.

are all without merit.

Don D. Skypeck, with whom J. Ruth Sproull, David P. Kimball, III, and James J. Hamula, Phoenix, Ariz., were on the brief, for petitioner.

David A. Dana, Atty., Dept. of Justice, with whom Barry M. Hartman, Acting Asst. Atty. Gen. and Michael A. McCord, Atty., Dept. of Justice, and Raymond Ludwiszewski, Acting Gen. Counsel and Lawrence E. Starfield, Acting Asst. Gen. Counsel, E.P.A., Washington, D.C., were on the brief, for respondents. George B. Wyeth, Atty., E.P.A., Eileen T. McDonough and Lewis M. Barr, Attys., Dept. of Justice, Washington, D.C., also entered appearances, for respondents.

Before: MIKVA, Chief Judge, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Apache Powder Company operates a plant in St. David, Arizona. From 1922 to 1963 it manufactured nitroglycerine-based explosives, and since 1963 has made ammonium nitrate. A by-product of these efforts, according to the Environmental Protection Agency, is waste water in unlined ponds with high levels of nitrates and heavy metals, as well as nitrates in shallow wells that EPA contends are "downgradient of the Apache site", and nitrates in the San Pedro River, which borders the Apache site. See Brief for Respondents at 10 (citing Hazard Ranking System Package for Apache Powder Co., St. David, Arizona, NPL–FRU9–2–87A).

Apache here seeks reversal of a decision by the EPA to include Apache on its National Priorities List. The agency creates the list pursuant to powers granted by the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675 (1988), and uses it to identify the sites that in its view deserve the highest priority for clean-up of hazardous substances or other pollutants or contaminants. The primary issue involves EPA's handling of the interaction between CERCLA and a sibling statute, the Resource Conservation and Recovery Act, as amended in 1984, codified at 42 U.S.C. §§ 6901 et seq. (1988) ("RCRA"). Specifically, Apache claims that EPA violated its policy not to list a site under

CERCLA if it can be cleaned up under Subtitle C of RCRA. We find the agency's decision here consistent with the policy and not reversible on the other grounds claimed.

\* \* \*

CERCLA employs two principal means to attack wastes thought to be dangerous. First, it establishes a fund, the "Superfund", to finance EPA remedial action on contaminated sites. 42 U.S.C. § 9611. Second, it imposes liability for the cost of clean-ups on various parties. 42 U.S.C. § 9607. It directs EPA to establish criteria for determining the highest-priority sites for removal of releases or threatened releases of hazardous substances, pollutants, and contaminants, CERCLA § 105(a)(8)(A), 42 U.S.C. § 9605(a)(8)(A), and then to use the criteria, dubbed the Hazardous Ranking System ("HRS"), to prepare a National Priorities List, *id.* § 9605(a)(8)(B). Under the HRS, sites receiving a score of 28.5 or above go on the List. See 48 Fed.Reg. 40,658–60 (Sept. 8, 1983). See generally 40 CFR pt. 300, App. A (1990) [1] (detailing HRS calculation); see also *Eagle–Picher Indus. v. EPA*, 759 F.2d 905, 909–11 (D.C.Cir.1985) ("*Eagle–Picher I*") (explaining HRS scoring system in general terms). Inclusion on the List normally leads to remedial action, although not automatically; EPA could back off in light of difficulties and other higher priorities. Nor does listing automatically give rise to liability. See *Eagle–Picher I*, 759 F.2d at 920; *Eagle–Picher Indus. v. EPA*, 759 F.2d 922, 932 (D.C.Cir. 1985) ("*Eagle–Picher II*"). Conversely, though the EPA will spend Superfund money for remedial actions only at NPL sites, see 40 CFR § 300.425(b)(1), CERCLA liability does not depend upon listing, *id.* § 300.-425(b)(4).

Subtitle C of RCRA, 42 U.S.C. §§ 6921–39b, provides alternative authority by which EPA can bring about certain clean-up operations. The authority applies to "hazardous wastes" or "hazardous constituents"; i.e., a narrower class of materials than the hazardous substances and pollutants and contaminants covered by CERCLA, see 42 U.S.C. §§ 9601(22), 9605(a). The power is exercised either by "corrective action" requirements in permits issued under Subtitle C, see 42 U.S.C. §§ 6924(u) and (v), or by corrective action orders issued for so-called "interim status" facilities (ones for which a RCRA permit has been sought but not yet issued), see *id.* at §§ 6925(e), 6928(h).

By long-standing policy,[2] EPA will "defer listing sites that could be addressed by the RCRA Subtitle C corrective action authorities". 54 Fed.Reg. 41,000, 41,004/1 (Oct. 4, 1989). This deferral is designed, according to the agency, to "avoid duplicative actions, maximize the number of clean-ups, and help preserve the [Superfund]". *Id.* at 41,008/3. The EPA has found the policy inapplicable where it was uncertain whether the RCRA authorities covered the pollution. Thus, for example, it has declined to defer as to "[s]ites where RCRA corrective action *may not apply* to *all* the contamination at the site." 53 Fed.Reg. 23,978, 23,982/3 (June 24, 1988) (emphasis added).

In August 1990 the EPA added Apache to the NPL on the basis of a score of 39.09. 55 Fed.Reg. 35,502, 35,509 (Aug. 30, 1990). The listing rested on EPA's conclusion that its deferral policy was inapplicable because "it is *not clear* that RCRA Subtitle C corrective action authorities can address the contamination of ground water by nitrates

---

**1.** HRS revisions took effect in March 1991, 55 Fed.Reg. 51,532 (December 14, 1990), but are not relevant as Apache was ranked before the revisions went into effect.

**2.** Apache refers to the policy as a "rule", but we use EPA's label, "policy", because the deferral practice looks—at a glance—more like a policy. We make no formal classification, however, for the distinction is of no importance for this case. We accept Apache's premise that EPA could not deviate from the deferral principle without a

justification. *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970). If we found a deviation, which we do not, the rule-policy distinction would assume significance, for not only could EPA not deviate from a legislative rule without explanation, it could not deviate at all until it adopted a new rule, using the notice-and-comment procedures prescribed by 5 U.S.C. § 553 unless it could fit the matter within an exception.

at the site." See Memorandum of Steve Heare, Chief, Compliance and Implementation Branch, Office of Waste Programs Enforcement, EPA, in NPL Docket No. NPL–U7–2–191C, reproduced at Deferred Appendix at 196–200, 200 (emphasis added); see also 55 Fed.Reg. at 35,509 ("One site is being listed, consistent with the NPL/RCRA policy, because the contamination *may not be addressable* under RCRA subtitle C corrective action authorities: Apache Powder Co., St. David, Arizona.") (emphasis added).

■ Apache makes two arguments based on the relation between RCRA and CERCLA. First, as CERCLA clean-up will draw on Superfund,[3] while RCRA will not, Apache argues that EPA's choice of CERCLA is irrational. But the statute authorizing the NPL does not direct EPA to consider such a factor in developing its criteria or in creating the List. See 42 U.S.C. § 9605(a)(8). Moreover, clean-up under Subtitle C of RCRA might in the agency's estimation be slower, more uncertain, and/or less thorough, thus justifying the extra cost to the government of proceeding by way of CERCLA. See 54 Fed.Reg. 41,-000, 41,007/3 (Oct. 4, 1989) ("NPL/RCRA policy considers which authority is likely to most expeditiously accomplish cleanup"); *id.* at 41,008/3 (site subject to Subtitle C may nevertheless be listed where "expeditious clean-up appeared to be unlikely under RCRA"). These are policy questions appropriate for agency resolution. Besides, Apache's argument neglects the fact that mere listing does not mean that a site will necessarily be cleaned up under CERCLA. Even if a decision to clean-up under CERCLA rather than under RCRA constituted a poor financial judgment, the listing here is not such a decision.

Apache's pointing to the possibly detrimental budgetary impacts of EPA's choice may make the reader wonder why Apache

prefers RCRA to CERCLA, with its potential for having the expenses borne by Superfund (and evidently not recoverable, for mere pollutants or contaminants, against private parties, see note 3 above). At oral argument Apache's counsel identified the following as the disadvantages of CERCLA where accompanied by listing on the NPL: (1) the stigma, including harm to business reputation and good will, (2) harm to the owner's credit, and (3) difficulties in selling or mortgaging the site.

■ This leaves Apache's second, and more serious, RCRA-related objection—the agency's supposed disregard of its deferral policy. Recall that the agency refused to apply the policy because of the exception for sites as to which "RCRA corrective action *may* not apply to *all* the contamination", 53 Fed.Reg. 23,978, 23,982 (June 24, 1988) (emphasis added); and see discussion at pp. 68–69 above. EPA says that RCRA may not provide authority over nitrates.

The uncertainty involves the exact scope of RCRA § 3008(h), 42 U.S.C. § 6928(h), and of RCRA § 3005(c)(3), 42 U.S.C. § 6925(c)(3). We agree with the agency that neither of these sections clearly applies to nitrates. The relevant part of § 3008(h) provides:

> Whenever on the basis of any information the Administrator determines that there is or has been a release of *hazardous waste* into the environment from a facility ... the Administrator may issue an order requiring corrective action or such other response measure as he deems necessary to protect human health or the environment....

*Id.* (emphasis added). Similarly, EPA's powers to issue corrective action orders in a Subtitle C permit, as the statutory authority, RCRA §§ 3004(u)–(v), 42 U.S.C. §§ 6924(u)–(v) (1988), apply only to *hazardous wastes* or *hazardous constituents*.[4] It

---

3. And, moreover, the Superfund expenditures may not be subject to recovery from Apache, because nitrates are not a "hazardous substance" but "at most a 'pollutant or contaminant'", Apache Brief at 26, and we have said that CERCLA permits EPA recovery only for removal of hazardous substances. See *Eagle–Picher II*, 759 F.2d at 932.

4. Despite some ambiguities in § 3004(v), EPA reasonably reads the provision as covering only hazardous wastes that have migrated beyond the facility boundary, see Brief for Respondents

is undisputed that nitrates are neither hazardous wastes nor hazardous constituents, as defined by 40 CFR §§ 261, et seq.; see Apache Brief at 19 & n. 7 (stating that nitrate is neither a hazardous waste nor a hazardous constituent), *id.* at 26 (similar). Thus the literal language of § 3008(h) does not cover nitrates. As no court has yet construed the section to cover non-hazardous wastes, it is at best an open question whether § 3008(h), or §§ 3004(u) or (v), applies to the nitrates at Apache's site.

Section 3005(c)(3) supplies a second possible source of statutory authority: "Each permit issued under this section shall contain such terms and conditions as the Administrator (or the State) determines necessary to protect human health or the environment." 42 U.S.C. § 6925(c)(3). Apache argues that this section, when coupled with § 3008(h), grants the agency authority to regulate the clean up of nitrates under RCRA. But such a construction is at least in some tension with §§ 3004(u) & (v), specifically authorizing permits to contain corrective action terms as to hazardous wastes and hazardous constituents. And Apache does not claim that any court has accepted such a broad reading.

Apache points, however, to the EPA's proposed corrective action rule, 55 Fed. Reg. 30,798 (July 27, 1990), as evidence that EPA itself regards § 3005(c)(3) as validating corrective action to remedy the release of any chemical constituent, including non-hazardous wastes, that may threaten human health or the environment. EPA's language is in fact somewhat narrower, however:

> 4. *Management of Non–Hazardous Solid Wastes* (§ 264.552). In other cases, wastes addressed under corrective action will not meet the specific RCRA definition of hazardous waste. *Many wastes that do not meet the RCRA regulatory definition of hazardous wastes contain varying concentrations of hazardous constituents that, if the waste is improperly disposed of, could be released to ground water, surface water,*

*soil, or air.* The goal of corrective action is to protect human health and the environment by removing these contaminants from the environment, and controlling the source of the release—even if the waste from which the release originated does not meet the regulatory definition of hazardous.

*Id.* at 30,844/3–45/1 (emphasis added); see also proposed § 264.552, "Management of non-hazardous solid wastes." Besides, if EPA should actually *adopt* the proposed rule, there is no assurance that a court would necessarily uphold this language, not to mention an interpretation broad enough to sweep in Apache's nitrates. Although the actions of the EPA and the State of Arizona in initiating the RCRA permitting process for Apache suggest that the agency believes it can exercise RCRA permitting authority over Apache's nitrates, such a belief is quite consistent with a thoroughly legitimate concern that it *may* lack the necessary legal authority.

A binding commitment by Apache to clean up its site under RCRA might have adequately satisfied EPA's doubts—or even, though the point is slightly different, made refusal to apply the deferral policy arbitrary and capricious. But while Apache emphasizes its willingness to bear the costs of a RCRA clean-up, it has failed to make such a commitment—to put its money where its brief is. Apache negotiated over an extended period of time with the EPA over the terms of a possible RCRA permit, see Supplement to Deferred Appendix, Exhibit "A",[5] but the company neither made an unconditional offer to proceed under RCRA nor unconditionally accepted any of EPA's proposals. Accordingly, EPA's doubts about its ability to apply RCRA corrective action were not insubstantial and its conduct was consistent with its policy.

\* \* \*

■ Apache closes its brief with a couple of random shots. First, it says that EPA's prior proposals to list the site, in 1986 and 1988, which according to Apache fell

---

at 8, and Apache substantially agrees, see Apache Brief at 17.

5. Admitted as part of the record pursuant to petitioner's motion, which we hereby grant.

through for want of evidence, indicate that its real reason for listing in 1990 was to justify the prior wasteful expense of taxpayer dollars. Even if all this be true, however, it would not authorize us to invalidate a listing that meets the criteria of the HRS.

█ Second, Apache attacks the scientific basis of EPA's conclusion by a vague reference to its own consultant's finding of abundant "scientific and technical defects". Apache Brief at 24. And its consultant found "substantially lower" nitrate levels at the site than did EPA's. *Id.* at 25. But in the absence of specific reasons to discredit the EPA's factual findings, as in recent cases such as *National Gypsum Co. v. EPA*, 968 F.2d 40 (D.C.Cir.1992); *Kent County, Delaware Levy Court v. EPA*, 963 F.2d 391 (D.C.Cir.1992); *Anne Arundel County, Maryland v. EPA*, 963 F.2d 412 (D.C.Cir.1992), we must defer to the agency.

Accordingly, Apache's petition for review is *Denied.*